ÍTott, J.,
dissenting:
Of most things which are bought and sold the value or prices in the direct ratio of the quantity. Thus if a sack of flour weighing fifty pounds be worth §3, one weighing one hundred pounds would be worth $10; or, if a yard of cloth be worth $2,. ten yards would be worth $20. It may be true in many cases that a large article is more valuable than a small one of the same variety, as in the case of fruit, where<a barrel of large apples is worth more than a barrel of small ones, though of the same kind; yet here the unit is the barrel and not the apple, and the difference of size in the fruit is reckoned as a difference of quality, the fact remaining always that a hundred barrels of the same kind and quality will not cost more than a hundred times the cost of one barrel, but ordiuarily less.
Of some other things, however, either because of the extraordinary rarity of the greater size, or of extraordinary difficulties in manufacturing or transporting, the value or price is cumulative. The most notable examples of these are diamonds and plate-glass. For a long time the rule for computing the value of diamonds of equal purity ran in this way:
If a diamond of I carat were worth £8, one of 2 carats would be worth £32; one of 3 carats would be worth £72; one of 20 carats would be worth £3,200.
And it is stated in The Attorney-General v. The Plate-Glass-Company, (1 Anst. R., 43,) that if a piece of plate-glass be cut in two it will, not have one-eighth of the value that it had» before.
The counsel for the claimant maintained, on the argument *634 -of this demurrer, that the price or value of dressed bnildiug-stone is, by universal custom, of this cumulative character. If that had been alleged in the petition, and conceded by the demurrer, there could not be a doubt that the contract here, intended likewise a cumulative price. Gourts, however, may refer to learned treatises and works upon an art or trade, and accordingly I have examined a great number of works upon architecture, engineering, and building, and also the Loudon Builder’s Price-Book, without finding the slightest information on the , value or price of-building-stone. There is, indeed, an extraordinary dearth of information in auy way relating to the subject. Pacts and formulas abound as to the cost of brick, concrete, wood, and iron, but nothing which relates to stone. Learned books have been written for the use of architects and builders devoted exclusively to building-stones, dealing with their density, durability, chemical constituents, locality, and ¡geological history,'yet entirely silent on the subject of cost. Therefore if any such custom in this trade exist, it is not one known to the court, or which can be made known to the court in any way save by allegations and evidence. The claimants have not made such averments, but have been conteut to stand entirely upon the letter of the contract.
The language to be interpreted in this contract is as follows:
• “The party of the first part hereby covenants and agrees to pay the sum of sixty-five cents per cubic foot for all stoues, when the quarried dimensions do not exceed twenty cubic feet in each stone, and one cent additional for every cubic foot of those having such dimensions exceeding tweuty feet.”
The entire controversy and $70,745.74 depend upon the meaning of seven words, “ one cent additional for very cubic foot.”
Three interpretations have been ascribed to this clause :
1st. That the price intended was sixty-five cents per foot for ■stones of twenty feet or less, and for larger stoues sixty-six cents; which is the interpretation of the court.
2d. That the price intended was sixty-five cents per foot for stones of twenty feet or less, and fpr larger stones one cent additional “ for every cubic foot ” in a stone except the first itwenty; which is .the interpretation said to have been given to ■the clause by the Supervising Architect of the Treasury.
■3d. That the price intended was sixty-five cents per foot for *635 stones of twenty feet or less, and for larger stones sixty-five cents plus one cent for every cubic foot coutained in a stone ; which is the interpretation of the claimants. .
As to the second interpretation it is manifest that it inserts a provision not to be found in the contract by excepting from the computation the first twenty feet. The words “for every cubic foot” deny any such limitation, and it is generally conceded that its arbitrary insertion by construction would be factitious and fanciful. The controversy, therefore, is reduced to the simple question whether the price of the class of larger stones was intended to be fixed or cumulative.
The first interpretation ascribes to this class of stones a fixed price, but in regard to it there are several things to be said.
' In the first place, if all that the parties intended when they entered into their agreement was to designate for two classes of stones two fixed prices, it is utterly incomprehensible that they did not say so in so many words. When they said that “ sixty-five cents” was to be the price of the one class why did they not say that sixty-six cents should be the price of the other ? If all that they meant was that for stones under twenty feet' the price should be sixty-five cents, and for stones over twenty feet, sixty-six, why did they go so far out of their way to avoid saying three such simple words as “sixty-six cents'?” If they did not intend a varying scale of cumulative prices for this class, why did they provide a fixed price for the first class and a cumulative scale for the second 7 Certainly, if the words “sixty-five cents per cubic foot and one cent additional for every foot of those having dimensions exceeding twenty feet” were used to express nothing more than “ sixty-six cents,” they furnish as ridiculous a paraphrase as can be found in English literature.
In the second place, this contract contains no limitation as to the size of the stone which the claimants were to furnish ; and, on the contrary, bound them under very stringent penalties to furnish “ all such stone as might be required in the construction” of the Hew York post-office. Apart from any knowledge of a custom of cumulative prices, ordinary intelligence suggests that a contract to furnish stone of unlimited dimensions at the trivial advance of one cent a foot over the price agreed upon for the smallest would be ruinous. The language of the contract is the thing to be interpreted, but itjs to *636 be interpreted, according to the subject-matter of the contract. If a contract were to provide for the sale of “ a thousand barrels of flour at $5 per hundred,” would any court need extrinsic evidence to show that “hundred” meant oue hundred pounds, and not oue hundred barrels ? If a contract were to provide for the sale of “fifty firkins of butter at 30 cents each, and fifty at 25 cents each,” is there a court in the world that would say that the price was literally twenty-five or thirty cents for the whole firkin of butter! if a mere literal reading of a contract were the highest rule of construction, is it not manifest that »• grammar class of school-boys in some of our well-taught public schools would furnish the very best expouuders of contracts ¶
In the third place, the defendants here conceded as the work progressed that/ the contract intended a cumulative pricej though the parties differed as to the starting-point of computation. Contemporary construction is an item of great weight where an ambiguous clause is the subject of construction j and it is rarely warrantable for courts to go behind it and say that they know better what, the parties intended than they knew themselves — to say that the price was intended to be fixed when both parties treated it as cumulative.
In the fourth place, it is a matter of legislative and executive history that the price of the similar stone bought by the Government for the Treasury Department was seventy cents per foot for stones of ten feet; eighty cents for stones of twenty feet j ninety cents for stones of thirty feet, &e.j in other words, that there was a cumulative price of “one cent for every additional cubic foot,” though the standards or rests agreed upon as the basis of computation varied from the single rest provided by this contract. In the case of the cap-stones of the piers of the outside stairways the dimensions of each stone were 18 x 17 x 1.10, and the cumulative contract-price for these six stones amounted to $102,000. This enormous cost led to the interference and investigation of Congress, and thus the matter became one of public notoriety.
I am therefore of the opinion that the contract in this particular means what it says; and that what it says is that the price of the larger class of stones shall be per cubic foot 65 cents + (1 cent x the number of feet in the stone.)
Should the claimants wish to amend by making proper aver- *637 rnents in regard to the cumulative value of building-stone, there can be no doubt of their right to introduce such evidence. It is true that evidence of usage is usually confined to the interpretation of words or phrases which may or may not appear to be technical; as, for instance, to show that a “thousand rabbits” did not mean ten hundred, but one hundred dozen, (Smith v. Wilson, 3 Barn. & Adol. R., 728;) or that “twelve shillings per day for each house-carpenter employed” did'not mean a day’s work between daylight and dark, but ten hours, (Hinton v. Locke, 5 Hill R., 437;) nevertheless, extrinsic evidence is always admissible to show the subject and surrounding circumstances of a contract. “ Every contract must have an interpretation governed in some measure by the subject-matter to which it relates, and at the same time with reference to any known usage connected therewith.” (Chief-Justice Whitman, in Robinson v. Fish, 25 Maine R., 401.) Parol evidence is not admissible to alter the written contract, but it is admissible, as was admirably said by Chief-Justice Tiudal in the case of Lady Hewley's Charities, (9 Clark & Fin. R., 367,) “for the purpose of making the written instrument speak for itself.” And I know of no court which has gone farther in this direction than the Supreme Court; and, indeed, I know of no case which has carried the principle so near the verge of laxity as the leading case of Bradley v. The Washington Steam Packet Company, (13 Peters, 102,) a case where by the light of extrinsic evidence a written contract binding the defendants “to hire the steamboat Franklin until the Sidney is placed on the route,” was construed to mean that they were not bound to hire her till the Sidney was placed on the route, but might discharge her if in the mean time the river became closed by ice. Of later eases it is sufficient to refer to Wash v. Towne, (5 Wall. R., 699,) where it is emphatically declared that courts “are never shut out from the same light which the parties enjoyed when the contract was executed,” and may view the circumstances “ as they viewed them, and-so as to judge of the meaning of the words and of the correct application of the language to the things described.”
As to the second cause of action, I concur with the majority of the court. As to’ the third, I am of the opinion that there was an agreement by the agent of the Government, subject in terms to the approval of Congress, and that this case conse *638 quently comes within the principle of Shaver & Corse (4 C. Cls. R., 440;) but inasmuch as the order as framed sustaining the demurrer will best facilitate the claimants in either presenting their whole case by amendment or in taking au appeal, I join, in the direction for judgment on the demurrer.